CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

*for Lynchburg*

OCT 2 5 2006

JOHN F. CORCORAN, CLERK
BY: *L. Bright*
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

| | |
|---|---|
| WAYTEC ELECTRONICS CORPORATION )<br> Plaintiffs, )<br> )<br>v. )<br> )<br>ROHM AND HAAS ELECTRONIC )<br>MATERIALS, LLC, )<br> )<br>and )<br> )<br>NORTHERN LAMINATE SALES, INC., )<br>d/b/a NLS TECHNOLOGIES )<br> Defendants. ) | **Civil Action No. 6:05CV00024**<br><br>**MEMORANDUM OPINION**<br><br>**By: Samuel G. Wilson**<br>**United States District Judge** |

The is a suit by a manufacturer of printed circuit boards, Waytec Electronics Corporation ("Waytec"), against the manufacturer, Rohm and Haas Electronic Materials, LLC ("Rohm and Haas"), and Northern Laminate Sales, Inc. ("NLS"), the distributor, of a chemical solution designed for copper plating of printed circuit boards, Copper Gleam PPR ("Copper Gleam"), that Waytec used in its manufacturing process.[1] After having successfully used Copper Gleam in its manufacturing process for three years or more, Waytec began to experience intermittent cracking of the copper plating on some of its circuit boards. Deciding that Copper Gleam was the problem, Waytec sued Rohm and Haas and NLS alleging fraud in the inducement, breach of express and implied warranties, negligence, and conspiracies to defraud and willfully injure Waytec. Rohm and Haas and NLS moved for summary judgment on multiple grounds: that

---

[1] Waytec is a Virginia corporation with its principal place of business in Virginia; Rohm and Haas is a Delaware limited liability company with its principal place of business in Delaware; and NLS is a New Hampshire corporation with its principal place of business in New Hampshire. There is more than $75,000 in controversy, and therefore, diversity jurisdiction is appropriate pursuant to 28 U.S.C. § 1332.

Waytec had no evidence of fraud, that Waytec had no evidence that Copper Gleam caused the copper plating to crack, and that they had disclaimed all warranties except the warranty that the product was within customary trade tolerances, of uniform quality and conformed to the seller's specifications, and that even in that instance they had disclaimed consequential and incidental damages. After reviewing the parties' summary judgment submissions, the court discerned scant, if any, evidence of fraud and only tenuous evidence of causation. Under the circumstances the court was concerned that Waytec had transformed a simple case of non-conforming goods involving sophisticated industrial users into a tort action. The court held the motion for summary judgment under advisement and informed the parties that it would proceed to trial in stages, and at the first stage require Waytec to prove its fraud case with clear and convincing evidence and that the latter stages would be dependent upon resolution of the first.[2]

After Waytec rested its fraud case at trial, the court found that there was no scientifically reliable evidence identifying Copper Gleam, rather than Waytec's own internal processes, as the source of the cracking and no evidence from which a reasonable jury could find by clear and convincing evidence that either Rohm and Haas or NLS fraudulently induced Waytec to purchase Copper Gleam. Accordingly, the Court announced that it found no material issue of fact to submit to the jury and that it would grant judgment as a matter of law to Rohm and Haas and NLS. This opinion memorializes and supplements the court's reasoning.

---

[2] For example, if Waytec succeeded in proving its actual fraud claim, defendants could not enforce their warranty disclaimers. See George Robberecht Seafood, Inc. v. Maitland Bros. Co., 255 S.E.2d 682, 683 (Va. 1979). However, if Waytec failed to prove actual fraud, defendants' warranty disclaimers would be enforceable.

2

**I.**

Waytec ensures the electrical conductivity of its printed circuit boards through a technically demanding electrolytic copper plating process in which a layer of copper is added to the board's exposed surfaces and holes.[3] It immerses the boards in a chemical bath and uses an electric charge to create a chemical reaction that causes the copper to adhere. Initially, Waytec used a direct current process – a process in which the current flows in only one direction. Robert Welch, who is now Waytec's Process Engineering Manager, investigated changing Waytec's manufacturing process to increase Waytec's productivity and its ability "to run high aspect ratio boards." In 1997, after investigating for more than a year and after speaking with other engineers, Welch transitioned Waytec from its direct current process to a "pulse periodic reverse process" – a process in which the electric current flows in both directions. The new process called for an acid copper suitable for pulse periodic reverse applications. Waytec began purchasing Copper Gleam for that purpose.[4] Waytec had virtually no problems with the product for three years or more. In fact, the process and the product performed so well that Welch wrote an article extolling their virtues. Waytec was able to increase its production rate, essentially without incident. During this time, Waytec ran its electrolytic plating lines constantly, processing approximately 1200 circuit boards daily.

Beginning in 2000, however, Waytec began to experience some cracking problems in its

---

[3] Kenneth Shirley, Waytec's current President and CEO, estimated that one hundred fifty (150) variables are at play in Waytec's circuit board fabrication process.

[4] Waytec initially purchased the product from defendant's predecessor company, LeaRonal, Inc., which merged into Shipley Company, L.L.C. in July, 1999. Shipley then changed its name in January 2004, to become Rohm and Haas Electronic Materials, LLC.

3

circuit boards, most of which it caught through its own inspection. By 2001, however, it started to receive a significant number of complaints from its customers about the problem. The development of the cracking problem coincided with a change in Waytec's manufacturing process, as Waytec shifted from the production of double-sided boards to multi-layer boards and reduced the number of boards that it produced each day from approximately 1200 to 600 or 700. This decrease in production resulted in its electrolytic copper plating tanks sitting idle for long periods of time rather than running constantly.

Rohm and Haas and NLS representatives traveled to Waytec's facility on numerous occasions to assist in diagnosing the cause of the cracking and recommended a variety of changes to Waytec's production process. They suggested, for example, that Waytec needed to improve "additive analysis" and "in-process quality control," to use deionized water, and to use a chiller for temperature control.[5] At trial, Welch acknowledged that some of the representatives were his personal friends who were attempting to solve Waytec's problem; he did not even remotely suggest that they had deceived him. Waytec implemented some, but not all, of the suggestions, failing to adopt recommendations with regard to agitation, water quality, and temperature regulation. Welch testified that Waytec opted to ignore these recommendations despite the fact that some of the procedures were required by Copper Gleam's data sheets, because he did not think them necessary, claiming that he knew his own operation better than the product's supplier.

---

[5] Even Waytec's own consultant admitted that Waytec's internal processes were lacking. Mr. Grosso, hired *by Waytec* in 2002 to improve quality control, found many problems at Waytec, determining that, "There was an obvious lack of process control at Waytec." Specifically, he noted, among other problems, that Waytec did not monitor the PPR carrier and additive properly, failed to maintain its equipment, and failed to remove the buildup of organics properly. Waytec later hired Mr. Grosso as its Vice-President of Quality and Engineering.

4

He also rejected Rohm and Haas' recommendation that Waytec use a newer generation product, CuPulse, instead of Copper Gleam, because he thought the conversion would be too costly. However, he did follow one recommendation – the recommendation that he treat the chemical bath with carbon. He understood that the cracking was caused by a build-up of organics in the treatment solution and that he could control that build-up with carbon, although he viewed the treatment as too time-consuming and costly.

By 2004, all of Rohm and Haas' other customers had changed to newer products such as CuPulse, leaving Waytec as the sole user of Copper Gleam. Rohm and Haas refused to continue to supply Copper Gleam to Waytec in light of its failure to follow its recommendations and product specifications, unless Waytec executed a waiver of liability. Waytec refused and transitioned over a three-month period back to the direct current plating system and another supplier's product. At trial, Welch testified that because the cracking problem stopped when Waytec returned to the direct current process and switched to another supplier's product, he believed that Copper Gleam must have caused Waytec's cracking problem. He testified, however, that it was necessary for Waytec to clean its solution tanks before converting to the different chemistry, and that after a cleaning process he would not expect cracking. Welch also could not explain Waytec's unchallenged successful use of Copper Gleam for three years.

At trial, Waytec called Rocky Hilburn, and tendered him as an expert "in the fields of chemistry, as well as in the fields of chemicals, processes and materials related to circuit boards." Essentially, Hilburn testified that Rohm and Haas' internal documents early in the development process showed that "the additive concentration of a Copper Gleam PPR plating bath is severely depleted by leaving the anode in the solution during idle periods." This means that a breakdown

5

of the chemical can quickly lead to a byproduct in the electrolytic bath, that if not removed, can be the source of cracking. It can result in a loss of "throwing power," the ability to "throw" copper onto surfaces and into holes evenly, at a proper thickness. In Hilburn's opinion, Copper Gleam should have been capable of providing consistently good plating if the chemical had performed the way it was represented by defendants to perform;[6] however, he never examined or tested Copper Gleam or any of the circuit boards to determine what actually caused them to crack, and he could not rule out Waytec's own processes as the cause.

Waytec's fraud claim rests upon its allegation that the defendants knew by 1999 that the Copper Gleam chemistry was unstable and that they failed to share this information with it. Waytec suggests that Rohm and Haas was alerted to the defective nature of the Copper Gleam when it purportedly entered into monetary settlements with four other circuit board manufacturers, all Copper Gleam customers, who had complained of cracking.[7] Waytec also

---

[6] In fact, the product's technical data sheets on which Waytec relies specifically discloses under the heading "Bath Control, Replenishment" that "Copper Gleam PPR additive and carrier are consumed by electrolysis and lost passively during idle periods when the anodes are in contact with the solution," although it does not specifically quantify the rate of that loss. This disclosure is found in defendants' 1997 technical data sheet, see Pl. Ex. 1, and in subsequent data sheets through 2004. See e.g., Pl. Exs. 2, 4, 5, 6, 7.

[7] Defendants moved *in limine* to exclude the other alleged incidents of cracking and prior settlements. After reviewing the submissions of the parties, the court provisionally excluded the evidence because its probative value was substantially outweighed by the danger that the evidence would confuse the issues or mislead the jury. See Fed. R. Evid. 403. The court determined that admitting evidence of the other cracking incidents and the settlement of those incidents had a high probability to mislead the jury into making causal conclusions that were totally unsupported by the evidence. Waytec could not show that the other cracking incidents were "substantially similar" to those that occurred at Waytec, and proof of cracking and settlements is not proof that the Copper Gleam caused the cracking. Moreover, under Fed. R. Evid. 408, the evidence of prior settlements is not admissible to prove causation because the four "settled" claims were never adjudicated and their validity was disputed.

6

points to Rohm and Haas' development of new products as proof that the defendants realized that the Cooper Gleam chemistry was an unstable product.[8] Finally, Waytec contends that the defendants knew that Waytec's manufacturing process and process controls were not the cause of the cracking and that defendants' attempts to help Waytec fix the problem were disingenuous, since they allegedly knew that their own chemical caused the cracking problem.

## II.

A court may grant a motion for judgment as a matter of law if "during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a). Judgment as a matter of law is proper only if "there can be but one reasonable conclusion as to the verdict." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party. Id. at 251. The court is directed to "review all of the evidence in the record" and "draw all reasonable inferences in favor of the nonmoving party." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). In its determination, the court must consider the substantive evidentiary burden of proof that would apply to the trial. Anderson, 477 U.S. at 252-53. With these principles in mind, the court concluded that it should grant judgment as a matter of law to defendants.

---

[8] Rohm and Haas had, as early as 2001, identified Copper Gleam as "obsolete" and had taken steps to develop a new product, rather than to improve the current version. Waytec claims that this product development plan is evidence of the fact that the defendants knew that the Copper Gleam was defective and alleges that the defendants purposefully hid this information from it.

There were a number of deficiencies in Waytec's proof – including its failure to prove causation. Under the well-known <u>Daubert</u> standard, a trial judge acts as a "gatekeeper" to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 589 (1993). Pursuant to this role, the court determined that Waytec presented no scientifically reliable evidence that Copper Gleam rather than its own processes or other external factors caused the cracking it sought to attribute to Copper Gleam. This deficiency, by itself, is fatal to all of Waytec's claims, so the court addresses it first.

The two Waytec witnesses who offered opinions about Copper Gleam, Hilburn and Welch, offered no scientifically reliable evidence to support the conclusion that Copper Gleam caused Waytec's cracking. Despite being tendered as an expert "in the fields of chemistry, as well as in the fields of chemicals, processes and materials related to circuit boards," Hilburn offered no opinion as to the actual cause or causes of the cracking and testified that he could not rule out Waytec's own processes as the cause. Although Welch, Waytec's Process Engineering Manager, believed the problems Waytec experienced somehow were intrinsic to Copper Gleam because he no longer had the problems after he switched to another supplier's product, the analytical gap between the data and his belief is simply too great for his opinion to be considered scientifically reliable. First, Waytec's switch to a totally different electrolytic copper plating process – changing from the pulse periodic reverse process back to the direct current process – injects a host of unaccounted for variables into the causal analysis. Second, before switching to a competitor's chemistry it was necessary for Waytec to clean its solution tanks, and, as Welch acknowledged, after a cleaning process he would not expect cracking. Third, Welch could offer

8

absolutely no explanation as to why Copper Gleam met and even exceeded his performance expectations for three years or more. Fourth, Waytec opted to ignore some of the requirements specified by Copper Gleam's data sheets. Fifth, there were clear quality control lapses that he failed adequately to take into account or explain. Finally, Welch admitted that the electrolytic copper plating process is a technically demanding process and that cracking in printed circuit boards can be, and often is, caused by a variety of different factors. In sum, Welch's conclusion seemed to be based on correlation and guesswork rather than on causation. Under the circumstances, Welch's unsupported belief that Copper Gleam caused Waytec's cracking problems is not scientifically reliable.[9]

Waytec argued that alternative causes suggested by a defendant normally affect the weight the jury should give the expert's opinion and not its admissibility. The court agrees; normally they do not. But as the Fourth Circuit noted in a case involving a medical diagnosis, an opinion "that fails to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion on causation." See Westberry v. Gislaved, 178 F.3d 257, 265 (4th Cir. 1999). "Thus, if an expert utterly fails to consider alternative causes or fails to offer an explanation for why the proffered alternative cause was not the sole cause, a district court is justified in excluding the expert's testimony." Cooper v. Smith & Nephew, Inc. 259 F.3d 194, 202 (4th Cir. 2001) (citing Westberry, 78 F.3d at 265-66). Essentially, that is the

---

[9] Defendants moved *in limine* to exclude Welch's opinions. The court held their motion under advisement until the court could view the matter in light of a more fully developed record. Although the court excludes Welch's unsupported belief that Copper Gleam caused the problems Waytec experienced, in granting judgment as a matter of law, the court does not view the exclusion as procedurally or substantively significant. Even if not excluded, a demonstrably unsupported belief would not be sufficient evidence to establish causation.

case here, as Waytec has offered no scientifically reliable evidence that proves that Copper Gleam, rather than a host of other possible causes, was the source of the cracking. Welch's belief utterly fails to consider or explain alternative causes. His belief is scientifically untestable. As the Supreme Court has stated, "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 157 (1999) (quoting General Elec. Co. v. Joiner, 522 U.S.136, 146 (1997).

Waytec also argued that expert testimony is not always necessary to establish causation, and that here the jury could infer causation from circumstantial evidence. In effect, Waytec argued that the jury should be able to draw inferences concerning the cause of failures in Waytec's reverse pulse electrolytic copper plating process that neither its process engineering manager nor is retained expert could draw. Although Waytec correctly notes that causation need not always be established by expert testimony, "[a]n intelligent evaluation of facts is often difficult or *impossible* without the application of some scientific, technical, or other specialized knowledge." Fed. R. Evid. 702 advisory committee note. (emphasis added). That is certainly the case here. It would confound logic and legitimate deductive reasoning to permit a jury to draw inferences concerning a technical subject matter that trained experts in the field cannot legitimately draw.[10] As the Supreme Court deftly noted, "Inference is capable of bridging many

---

[10] Waytec also argued that the evidence the court excluded, that other Copper Gleam users also experienced cracking problems and that the defendants settled these claims, is additional circumstantial evidence of causation. That evidence, however, suffered from the same deficiencies as Waytec's other evidence. Waytec had no expert opinion that positioned those other instances as evidence of causation. Furthermore, proof of cracking is not proof that the Copper Gleam caused the cracking experienced by the other four circuit board manufacturers or by Waytec. It in no way rules out the user's processes, procedures and other conditions as

10

gaps. But not, in these circumstances, one so wide and deep as this." Galloway v. United States,

319 U.S. 372, 386 (1943). It follows that defendants are entitled to judgment as a matter of law.

## III.

Although Waytec's failure to prove causation is fatal to all of its claims, the court notes

that its claims fail for other substantial reasons, as well. The court briefly catalogs those reasons.

### A. **Actual Fraud**

Waytec's evidence of fraud was lacking in several important respects. To prove actual

fraud under Virginia law, a plaintiff must prove six elements by clear and convincing evidence:

"(1) a false representation, (2) of material fact, (3) made intentionally or knowingly, (4) with

intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled."

Prospect Dev. Co. Inc. v. Bershader, 515 S.E.2d 291, 297 (Va.1999) (citations omitted). In

addition to not proving element six, causation, Waytec failed to prove elements one, four and

five, as well.

The false representation Waytec alleges it relied on is the representation that Copper

Gleam was suitable for use in Waytec's manufacturing process, and it appears to be nothing more

than the ordinary grist of a fitness for particular purpose claim. Essentially, Waytec argued that

defendants made false statements every time they shipped Copper Gleam together with the

product's technical data sheet which failed to reveal Copper Gleam's "deficiency" – that it could

break down rapidly under certain circumstances, leading to a build-up in organics. Although the

theory appears flawed at several levels, it is flawed at the most basic level: the product's

---

possible or even probable causes. Nor, for the same reason does it necessarily demonstrate that
defendants had knowledge of a material problem that they failed to disclose. The same is also
true for the settlement of disputed claims.

11

technical data sheets which Waytec relies on specifically disclose under the heading "Bath Control, Replenishment" that "Copper Gleam PPR Additive and Carrier are consumed by electrolysis and lost passively during idle periods when the anodes are in contact with the solution." In other words, Copper Gleam could break down under certain circumstances, leading to a build-up in organics. Under the circumstances, a reasonable jury could not conclude that Waytec had proven element one – a false statement – by clear and convincing evidence.

In the light most favorable to Waytec, the evidence could not support a verdict that defendants intended to mislead Waytec. Welch thoroughly researched before converting from a direct current process to a pulse periodic reverse process and selected Copper Gleam. There is no evidence that defendants engaged in any marketing campaign to affect Welch's decision. Copper Gleam clearly met Waytec's needs for more than three years. Rohm and Haas' technical data sheet for Copper Gleam disclosed that it could break down under certain circumstances. When those circumstances arose Rohm and Haas suggested that Waytec treat the build-up of organics with carbon. The treatment worked, although Waytec considered it too time-consuming and expensive. Welch conceded that the Rohm and Haas employees dispatched to Waytec attempted to help, not mislead. Finally, Rohm and Haas recommended that Waytec use its newer generation product CuPulse because the rate of its breakdown and the creation of byproducts in the electrolytic bath were easier to quantify.[11] However, Waytec rejected that recommendation

---

[11] Waytec also argued that the development of CuPulse was evidence that defendants knew that Copper Gleam was defective. The argument that the introduction of a newer generation product implies the unfitness of an older one is unsound, especially under the circumstances present here. As the evidence clearly demonstrates, these products are not fungible. Product changes may require time-consuming and costly process changes. A product supplier may leave its product on the market for the user's benefit, even though the supplier would prefer to discontinue it. Indeed, that is precisely what happened here – Rohm and Haas

12

because of the expense involved.[12] Under the circumstances, no reasonable jury could conclude that Waytec had proven element four, that defendants intended to mislead Waytec, by clear and convincing evidence.

Lastly, Welch's own testimony reveals that he relied on his own independent judgment, not Copper Gleam's technical data sheet in selecting and ultimately discarding Copper Gleam. Based on his own considerable base of technical knowledge, Welch rejected some of the data sheet's requirements because he did not think them necessary, claiming that he knew his own operations better than the product's supplier. Again, under the circumstances, no reasonable jury could conclude that Waytec had proven element five, reliance, by clear and convincing evidence.

## B. Constructive Fraud

Constructive fraud has the same elements as actual fraud except "the misrepresentation of material fact is not made with the intent to mislead, but is made innocently or negligently." Hitach Credit American Corp. v. Signet Bank, 166 F.3d 615, 628 (4th Cir. 1999). Therefore, like Waytec's actual fraud claim, Waytec's failure to prove causation, a false representation, and reliance is fatal.

Waytec's constructive fraud claim also is barred by Virginia's economic loss rule. Pursuant to this rule, "losses suffered as a result of the breach of a duty assumed only by agreement, rather than a duty imposed by law, remain the sole province of the law of contracts."

---

continued to manufacture Copper Gleam specifically for Waytec.

[12] Waytec has noted that defendants were motivated to commit fraud by its bottom line, pointing to evidence that Copper Gleam had a very high profit margin. The court views this evidence as a non-starter. The same is true of Waytec, as cost-concerns drove its refusal to convert to CuPulse.

13

<u>Filak v. George</u>, 594 S.E.2d 610, 618 (Va. 2004). The rule prevents a plaintiff from recovering "purely economic losses" in a tort action by simply recasting a contract claim as a tort claim. <u>See Sensenbrenner v. Rust, Orling & Neale, Architects, Inc.</u>, 374 S.E.2d 55, 57 (Va. 1988). Under the rule, except in the case of an intentional tort, a plaintiff cannot recover for a purely "economic loss," <u>Richmond v. Madison Mgmt. Group</u>, 918 F.2d 438, 446-47 (4th Cir. 1990). An injury to the end product of a manufacturing process allegedly caused by the incorporation of a component product supplier's defective component is an economic loss. <u>Virginia Transformer Corp. v. P.D. George Co.</u>, 932 F. Supp. 156, 162 (W.D. Va. 1996) (noting that constructive fraud in the inducement is not an intentional tort under Virginia's economic loss rule and that the "economic loss rule applies to cases of defective products where the only injury is to the product itself.").

Waytec attempts to evade application of the economic loss rule by alleging that it seeks recovery for damage caused to the electronics into which the cracked circuit boards were installed, classifying the end product as "other property" that is outside the scope of the contract between Waytec and defendants. <u>See Sensenbrenner</u>, 374 S.E.2d at 57 n.3.[13] A similar claim was rejected by the court in <u>Virginia Transformer Corp. v. P.D. George Co.</u>, 932 F. Supp. 156 (W.D. Va. 1996). There, the plaintiff sought to recover damages to electrical transformers allegedly caused by the defendant's chemical varnish. Plaintiff argued that the damaged transformers were outside the scope of the sales contract for the varnish, and thus exempt from the economic loss rule. <u>Id.</u> at 162. However, the court rejected the argument, stating that it was "unconvinced by a

---

[13] In Virginia, economic loss is defined as: "damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits -- *without any claim of personal injury or damage to other property* . . . as well as the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold." <u>Id.</u> (citation omitted) (emphasis added).

14

characterization of the transformers as 'other property,'" because the varnish was simply a component part of the final product. Id. See also E. River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858 (1986) (defective turbine parts are merely a part of an integrated system; under the economic loss rule, damage to the entire system is not recoverable). Similarly, here, the Copper Gleam is merely a component part of a completed electronic device. Therefore, Waytec did not suffer any loss to "other property," and the economic loss rule applies.

### C. Conspiracy to Defraud

Waytec also alleges that defendants entered into a conspiracy to defraud it. A common law conspiracy to defraud claim is moored to the elements of fraud. To prove a common law conspiracy, Waytec must prove concerted action by two or more persons "to accomplish some criminal or unlawful purpose, or to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means." Hechler Chevrolet, Inc. v. General Motors Corp., 337 S.E.2d 744, 748 (Va. 1985). "The gist of the civil action of conspiracy is the *damage caused by the acts* committed in pursuance of the conspiracy and not the mere combination of two or more persons to accomplish an unlawful purpose or use unlawful means." CaterCorp, Inc. v. Catering Concepts, Inc., 431 S.E.2d 277, 281-82 (Va. 1993) (quoting Gallop v. Sharp, 19 S.E.2d 84, 86 (Va. 1942) (emphasis added). The plaintiff must establish his claim by clear and convincing evidence. See Pierce Oil Corp. v. Voran, 118 S.E. 247, 251 (Va. 1923).

Here, Waytec failed to prove that defendants agreed to make a materially false statement for the specific purpose of misleading it, and thereby caused it injury. Accordingly, the claim fails essentially for the same reasons its actual fraud claim fails.

15

### D.  Statutory Business Conspiracy and Attempted Business Conspiracy

Waytec claims that defendants entered into a conspiracy for the specific purpose of willfully and maliciously injuring it in violation of Va. Code Ann. § 18.2-499(A) and (B), a claim that appears especially meritless.

To recover in an action for statutory conspiracy to harm a business, a plaintiff must prove a combination of two or more persons for the purpose of "willfully and maliciously injuring another in his reputation, trade, business, or profession," Va. Code Ann. § 18.2-499(A), and resulting damage to the plaintiff.  Va. Code Ann. § 18.2-500.  See Allen Realty Corp v. Holbert, 318 S.E.2d 592, 596 (Va. 1984).  Similarly, to prove attempted business conspiracy, a plaintiff must prove that a person attempted to procure participation or cooperation of another to enter into a business conspiracy,  Va. Code Ann. § 18.2-499(B), and resulting damage to the plaintiff.  Va. Code Ann. § 18.2-500.  Proof of civil conspiracy must be shown by clear and convincing evidence.  Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 108 F.3d 522, 526 (4th Cir. 1997).

The court will not belabor the point here, but taking all the evidence in the light most favorable to Waytec, it would have taken more than a stretch to conclude that Waytec's evidence supported an inference that defendants acted in concert for the specific purpose of injuring Waytec.

### E.  Negligence

Like its constructive fraud claim, Waytec's negligence claim is barred by the economic loss rule.  As previously stated, Waytec may not use a tort-based claim to recover for economic loss damages.

16

## F. Breach of Implied Warranties

Waytec seeks to recover damages for breach of the implied warranty of merchantability, alleging that Copper Gleam contained latent defects which caused it to be unsuitable for use in its manufacturing processes, and for breach of the implied warranty of fitness for a particular purpose, alleging that Waytec relied to its detriment on defendants' assurances that Copper Gleam was fit for its manufacturing processes. The claims fail, however, not only because Waytec failed to prove causation but also because defendants specifically and conspicuously disclaimed all warranties, except for certain express warranties, including all implied warranties of merchantability and fitness.[14]

The Uniform Commercial Code, as adopted by Virginia, allows parties to exclude or modify warranties.[15] "[T]o exclude or modify the implied warranty of merchantability. . . the language must mention merchantability and in [the] case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous." Va. Code Ann. § 8.2-316(2). Although defendants conspicuously disclaimed them here, Waytec argued that defendants' fraud precluded them from enforcing those disclaimers. However, for the reasons previously stated, Waytec failed to prove fraud, and defendants'

---

[14] Each invoice that Rohm and Haas sent to Waytec conspicuously displayed on its reverse side the following disclaimers under the heading "**DISCLAIMER OF ALL OTHER WARRANTIES**:" "THE FOREGOING [EXPRESSED WARRANTIES] ARE THE SOLE WARRANTIES MADE BY THE SELLER CONCERNING THE PRODUCTS. THERE ARE NO OTHER WARRANTIES, ORAL OR WRITTEN, AND, IN PARTICULAR, THERE IS NO IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE." Each sale invoice from NLS also disclaimed implied warranties.

[15] Defendants' sales invoices contain a choice-of-law provision that calls for the transaction to be governed by Massachusetts law. Neither party argued in favor of the application of Massachusetts law, and the court finds no reason to address the matter further.

17

disclaimers are effective.

## G. Breach of Express Warranties

Waytec also seeks to recover consequential damages for defendants' alleged breach of express warranties. As previously stated, however, each invoice conspicuously disclaims all warranties, except the warranty that Copper Gleam is, "subject to customary trade tolerances, of uniform quality and conform[s] to the Seller's specifications," and even that warranty specifically limits Waytec's remedy "to the furnishing of a like quantity" of Copper Gleam that conforms to that warranty, or at the seller's option, a refund of the purchase price. To the same effect, each invoice also specifically provides that "[i]n no case shall the Seller be liable for consequential or incidental damages."

The Uniform Commercial Code provides that parties may contract to limit their liability, Va. Code Ann. 8.2-316(4), including the exclusion of consequential damages entirely unless the exclusion is "unconscionable." Va. Code Ann. § 8.2-719(3). Nevertheless, Waytec essentially argued, as it did concerning defendants' disclaimers of implied warranties, that defendants' fraud precluded them from enforcing the exclusion of consequential damages. Again, however, for the reasons previously stated, Waytec failed to prove fraud. Accordingly, in addition to not proving causation, and because the court finds nothing unconscionable in this agreement between these two sophisticated industrial parties, the court concludes that defendants have effectively excluded consequential and incidental damages.

18

## V.

For the reasons stated, the court grants defendants' motion for judgment as a matter of law. [16]

**ENTER**: This October 25, 2006.

UNITED STATES DISTRICT JUDGE

---

[16] Although the court held defendants' motion for summary judgment as to all other claims under advisement pending resolution of Waytec's fraud claim at trial, the court notes that Waytec's claims fail as a matter of law, regardless of whether the court considers them under Rule 50 or Rule 56.

19